**UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION**

**RILEY MITCHELL,**

      **Petitioner,**

**v.**                                                                   **Case No. 8:19-cv-457-MSS-TGW**

**SECRETARY, DEPARTMENT
OF CORRECTIONS,**

      **Respondent.**

_____/

## O R D E R

Mitchell petitions for a writ of habeas corpus under 28 U.S.C. § 2254 and challenges his state court convictions for burglary of an unoccupied dwelling and petit theft, for which he is serving thirty years in prison. After reviewing the petition (Doc. 1), the response and appendix (Docs. 9 and 10), and the reply (Doc. 17), the Court **DENIES** the petition.

### FACTS

The evidence at Mitchell's trial showed that a maintenance supervisor for a property management company discovered a broken window in the rear of a house owned by the company. (Doc. 10-2 at 326, 336) A screen for the window was lying on the ground. (Doc. 10-2 at 336) A five or six-foot high chain linked fence enclosed the backyard of the house (Doc. 10-2 at 331–33), but a section of the fence always remained open for entering and exiting. (Doc. 10-2 at 332, 350) Inside the house the supervisor observed a collapsed ceiling in the master bedroom, a hole in the ceiling of a bathroom that led to the attic where the air handler was kept, and pieces of insulation for copper piping all over the floor in the garage. (Doc. 10-2 at 327–28, 338) Approximately seventy feet of copper tubing which connected the

1

air handler in the attic to the air condenser outside the house was missing. (Doc. 10-2 at 328, 341–42) Outside the house the air conditioner condenser, which was not enclosed by the fence, was also missing. (Doc. 10-2 at 328, 333–34, 350–51) The supervisor had visited the house four days earlier and had observed no damage. (Doc. 10-2 at 329)

A crime scene technician observed a red substance on the bottom of the window frame and a fleshy substance on the broken area of the window. (Doc. 10-2 at 366, 368) The technician observed the fleshy substance on the window inside the house and the red substance on the window outside the house. (Doc. 10-2 at 372–73, 377) The technician collected samples of both substances. (Doc. 10-2 at 367–68) DNA from the samples matched Mitchell's DNA. (Doc. 10-2 at 394–96, 400)[1] The maintenance supervisor denied knowing or employing Mitchell or giving Mitchell permission to break the window or remove the air conditioning unit from the house. (Doc. 10-2 at 345–46)

A month and a half after the burglary, a detective met with Mitchell and told him that he was under arrest for the burglary. (Doc. 10-2 at 406) The detective did not mention the air conditioner, copper wiring, and copper tubing missing from the house. (Doc. 10-2 at 406) The detective attempted to advise Mitchell of his constitutional rights, but Mitchell repeatedly interrupted the detective. (Doc. 10-2 at 406, 421) Mitchell did not admit to burglarizing the house owned by the property management company but generally admitted to stealing scrap metal from houses. (Doc. 10-2 at 418–19) He spontaneously denied taking something without permission but told the detective that he was a scrapper and had a family to support. (Doc. 10-2 at 408, 422) He admitted that he knew that he wrongly went inside abandoned houses,

---

[1] Also, the technician found one fingerprint (Doc. 10-2 at 374), but the fingerprint did not match Mitchell's fingerprints. (Doc. 10-2 at 404)

collected scrap metal, and sold the metal with his brother's help. (Doc. 10-2 at 409, 422) The detective observed scrapes and scars on Mitchell's arms. (Doc. 10-2 at 410–12)

The jury found Mitchell guilty of burglary of an unoccupied dwelling and grand theft. (Doc. 10-2 at 131–32) The trial court sentenced Mitchell as a habitual felony offender to thirty years in prison for the burglary conviction and a concurrent five years for the grand theft conviction. (Doc. 10-2 at 173–81) The state appellate court affirmed the burglary conviction without comment, reversed the grand theft conviction because the prosecution failed to prove the value of the items stolen, and remanded the case for entry of a judgment and sentence for petit theft, a lesser offense. (Doc. 10-2 at 522–23) The Court takes judicial notice of state court records which show that the trial court resentenced Mitchell to time served for the petit theft. Judgment and Amended Sentence, *State v. Mitchell*, No. 10-CF-19078-A (Fla. 13th Jud. Cir. Jan. 10, 2018). The thirty-year sentence for burglary was not affected. The post-conviction court denied Mitchell's motion for post-conviction relief after an evidentiary hearing (Docs. 10-3 at 141–50 and 10-7 at 2–25), and the state appellate court affirmed. (Doc. 10-9 at 158) Mitchell's federal petition follows.

## STANDARDS OF REVIEW

### AEDPA

Because Mitchell files his federal petition after the enactment of the Antiterrorism and Effective Death Penalty Act, AEDPA governs his claims. *Lindh v. Murphy*, 521 U.S. 320, 327 (1997). AEDPA amended 28 U.S.C. § 2254(d) to require:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim —

(1)    resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2)    resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

A decision is "contrary to" clearly established federal law "if the state court arrives at a conclusion opposite to that reached by [the U.S. Supreme Court] on a question of law or if the state court decides a case differently than [the U.S. Supreme Court] has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 412–13 (2000). A decision involves an unreasonable application of clearly established federal law "if the state court identifies the correct governing legal principle from [the U.S. Supreme Court's] decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. Clearly established federal law refers to the holding of an opinion by the U.S. Supreme Court at the time of the relevant state court decision. *Williams*, 529 U.S. at 412.

 "[AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law." *Bell v. Cone*, 535 U.S. 685, 694 (2002). A federal petitioner must show that the state court's ruling was "so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." *Harrington v. Richter*, 562 U.S. 86, 103 (2011).

**Ineffective Assistance of Counsel**

Mitchell asserts ineffective assistance of counsel — a difficult claim to sustain.

*Strickland v. Washington*, 466 U.S. 668, 687 (1984) explains:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

"There is no reason for a court . . . to address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697. "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690. "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Strickland*, 466 U.S. at 690.

"An error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment." *Strickland*, 466 U.S. at 691. To demonstrate prejudice, the defendant must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 691. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable." *Strickland*, 466 U.S. at 690–91. A defendant cannot meet his burden by showing that the avenue chosen by counsel was unsuccessful. *White v. Singletary*, 972 F.2d 1218, 1220–21 (11th Cir. 1992). Because the standards under *Strickland* and AEDPA are both highly deferential, "when the two apply in tandem, review is 'doubly' so." *Richter*, 562 U.S. at 105. "Given the double deference due, it is a 'rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding.'" *Nance v. Warden, Ga. Diag. Prison*, 922 F.3d 1298, 1303 (11th Cir. 2019) (citation omitted).

The state appellate court affirmed in a decision without a written opinion the post-conviction court's order denying Mitchell relief. (Doc. 10-9 at 158) A federal court "'look[s] through' the unexplained decision to the last related state-court decision that does provide a relevant rationale [and] presume[s] that the unexplained decision adopted the same reasoning." *Wilson v. Sellers*, 138 S. Ct. 1188, 1192 (2018).

Because the post-conviction court recognized that *Strickland* governed the claims (Docs. 10-3 at 143 and 10-7 at 4), Mitchell cannot meet the "contrary to" test in Section 2254(d). Mitchell instead must show that the state court either unreasonably applied *Strickland* or unreasonably determined a fact.

**Ground One**

Mitchell asserts that the state court violated his federal right to due process by denying his motion for judgment of acquittal. (Doc. 1 at 4) He contends that the prosecution failed to prove that the red and fleshy substances were left on the broken window on the day of the burglary. (Doc. 1 at 4) He contends that the prosecution instead relied on his

statements to police, even though police did not advise him of his constitutional rights, and relied on DNA evidence, even though the defense disputed that evidence. (Doc. 1 at 4) Mitchell asserts that the prosecution failed to prove his identity.

The state appellate court affirmed the burglary conviction and reversed the grand theft conviction in a written opinion because the prosecution did not prove the value of the items stolen. (Doc. 10-2 at 522–23) The written opinion does not comment on the due process claim that Mitchell raises in his federal petition. (Doc. 10-2 at 522–23) This Court looks through the state appellate court's opinion to the trial court's ruling on the claim. *Wilson*, 138 S. Ct. at 1192. The trial court denied the claim without explanation. (Doc. 10-2 at 431) The state court's denial of the claim without an explanation is an adjudication of the claim on the merits owed deference under Section 2254(d). *Richter*, 562 U.S. at 98.

"[A] state prisoner who alleges that the evidence in support of his state conviction cannot be fairly characterized as sufficient to have led a rational trier of fact to find guilt beyond a reasonable doubt has stated a federal constitutional claim." *Jackson   v.   Virginia*, 443 U.S. 307, 321 (1979). A petitioner is entitled to relief "if it is found that upon the record evidence adduced at the trial no rational trier of fact could have found proof of guilt beyond a reasonable doubt." *Jackson*, 443 U.S. at 324. The court views the evidence at trial in the light most favorable to the prosecution. *Jackson*, 443 U.S. at 319. Mitchell asserts that the prosecution failed to prove that he left the red and fleshy substances on the window on the day of the burglary and theft. (Doc. 1 at 4) In other words, Mitchell asserts that the prosecution failed to prove that he committed the crimes. The prosecution carried the burden to prove all elements of the crimes, including the identity of Mitchell. *Akridge v. State*, 970 So. 2d 917, 918 (Fla. 2d DCA 2007) (citing *State v. Freeman*, 380 So. 2d 1288 (Fla. 1980)).

A maintenance supervisor discovered a broken window in the rear of the house, copper tubing and copper wiring missing from inside the house, and an air condenser missing from outside the house. (Doc. 10-2 at 326–28, 333–34, 336, 341–42) The maintenance supervisor had visited the house four days earlier and did not observe any damage to the house. (Doc. 10-2 at 329) A crime scene technician observed a red substance on the outside of the broken window and a fleshy substance on the inside of the broken window and collected swabs of both substances. (Doc. 10-2 at 366, 368, 372–73, 377) DNA from the swabs matched Mitchell's DNA. (Doc. 10-2 at 394–96) The defense presented no evidence to rebut this DNA evidence. A detective spoke with Mitchell and tried to advise him of his constitutional rights. (Doc. 10-2 at 406, 421) Mitchell repeatedly interrupted the detective and spontaneously told the detective that he was a scrapper by trade, knew that he wrongly went inside abandoned houses, collected metal in the abandoned houses, and sold the metal for money. (Doc. 10-2 at 408–09, 422) "Voluntary and spontaneous comments by an accused, even after *Miranda* rights are asserted, are admissible evidence if the comments were not made in response to government questioning." *Cannady v. Dugger*, 931 F.2d 752, 754 (11th Cir. 1991). *Miranda v. Arizona*, 384 U.S. 436, 478 (1966) ("Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.").

Viewed in the light most favorable to the prosecution, the evidence at trial proved Mitchell's identity. Fingerprint and DNA evidence "is generally considered a species of circumstantial evidence." *Bedoya v. State*, 779 So. 2d 574, 577 (Fla. 5th DCA 2001). *Sorey v. State*, 419 So. 2d 810, 812–13 (Fla. 3d DCA 1982) (citations and footnotes omitted) explains:

> Where the sole evidence linking a defendant to the crime is
> fingerprints found in a place or on a thing accessible to the

general public and there is no other evidence to show that the prints were made at the time of the crime, courts must conclude that a defendant is entitled to a judgment of acquittal. . . .

Where, however, the prints are located in a place, on an object, or on a particular part of an object to which the general public does not have access, the hypothesis that the print was not placed on the object at the time of the crime is not one which the court must declare reasonable as a matter of law, and it remains for the jury to determine its reasonableness. This is so because in the latter instance we need not assume that the defendant as a member of the general public placed his fingerprint at the place or on the object at a time other than the crime.

Mitchell's DNA matched DNA from the fleshy substance on the broken window. (Doc. 10-2 at 394–96) The crime scene investigator testified that she found the fleshy substance on the inside of the broken window as follows (Doc. 10-2 at 372–73):

| [Prosecutor:] | . . . [Y]ou were giving us a description about with respect to the flaky substance and also the red substance. As it relates to State's Composite Two F, what is this a picture of? |
|---|---|
| [Witness:] | That is the flaky substance. |
| [Prosecutor:] | And this was the substance that was actually inside of the residence? |
| [Witness:] | Yes. This is a shot from the inside. This is the dining room window from the inside, and you can see around the edge here, this would be on the entry part here and here. |

The investigator described the substance in the photograph as "two small pieces of dried flaky flesh colored substance from the interior left dining room window around the broken glass area." (Doc. 10-2 at 377) Viewed in the light most favorable to the prosecution, this evidence proved that Mitchell broke the window and burglarized the house.

Mitchell presented no evidence that he lawfully entered the house. Copper tubing which connected the air handler in the attic to the air condenser outside the house was missing. (Doc. 10-2 at 328, 341–42) The supervisor observed a hole in the ceiling of a bathroom that led to the attic where the air handler was kept. (Doc. 10-2 at 327–280, 338) The maintenance supervisor had visited the house four days earlier and observed no damage. (Doc. 10-2 at 329) The supervisor denied knowing, employing, or giving Mitchell permission to break the window or remove the air conditioning unit from the house. (Doc. 10-2 at 345–46) Mitchell's DNA found inside the house in an area not accessible to the public, coupled with his admission that he generally burglarized houses and stole scrap metal, circumstantially proved that he burglarized the house in this case. *Rivero v. State*, 35 So. 3d 183, 185 (Fla. 3d DCA 2010) ("[T]here is record evidence that the defendant's DNA was found and collected from the inside of the window of the bakery, which was smashed during the burglary, in a room not accessible to the public. Thus, based on the totality of this evidence, we conclude that the State presented sufficient evidence to rebut the defendant's reasonable hypothesis of innocence."). *Duncan v. Stynchcombe*, 704 F.2d 1213, 1215 (11th Cir. 1983) ("[W]e hold that fingerprint evidence alone, under proper circumstances, can be sufficient to sustain a conviction for an offense like burglary against constitutional attack on the sufficiency of evidence principles set forth in *Jackson v. Virginia*, 443 U.S. 307 (1979).").

Also, the information charged Mitchell with "unlawfully enter[ing] or remain[ing] in a certain dwelling . . . with the intent to commit an offense therein." (Doc. 10-2 at 103) § 810.02(1)(b)(1), Fla. Stat. (2010). A dwelling means "a building or conveyance of any kind . . . which has a roof over it and is designed to be occupied by people lodging therein at night, **together with the curtilage thereof**." § 810.011(2), Fla. Stat. (2010) (bolding added).

The evidence showed that the broken window was in rear of the house (Doc. 10-2 at 327), and a six-foot high chain linked fence enclosed the backyard of the house. (Doc. 10-2 at 331–33) A screen for the window was lying on the ground. (Doc. 10-2 at 336) Even though a section of the backyard fence for entering and exiting always remained open (Doc. 10-2 at 332, 350), the enclosed backyard was part of the curtilage of the house. Therefore, the evidence proved that Mitchell entered the "dwelling." *Baker v. State*, 636 So. 2d 1342, 1344 (Fla. 1994) ("Entry onto the curtilage is, for the purposes of the burglary statute, entry into the structure or dwelling. Baker entered Wilson's yard which was protected by a fence and shrubbery where the owner had an expectation of privacy. Even though he did not enter Wilson's house, he did enter Wilson's 'dwelling.'"); *Chambers v. State*, 700 So. 2d 441, 442 (Fla. 4th DCA 1997) ("We conclude that the fencing in the present case, although it contained the ten to fifteen foot gap, conformed to the 'some form of enclosure' requirement of [*State v.* *Hamilton*[, 660 So. 2d 1038 (Fla. 1995)]. It would be a rare fenced yard which did not have a manner of ingress or egress through the fence, which may be gated or ungated.").

Viewing the evidence in the light most favorable to the prosecution, Mitchell's blood on the window proved that he entered the enclosed backyard and broke the window. The evidence proved that Mitchell entered the dwelling with the intent to commit an offense. *Baker*, 636 So. 2d at 1344 ("'The common law crime of burglary consisted of breaking and entering a dwelling house of another at night with the intent to commit a felony therein.' . . . The burglar no longer need intend to commit a felony; the intention to commit any offense, even criminal mischief, is sufficient to satisfy this element of the present statutory crime."). Consequently, the state court did not unreasonably apply *Jackson*.

Ground One is **DENIED**.

**Ground Two**

Mitchell asserts that trial counsel was ineffective for not moving to suppress his statements to police. (Doc. 1 at 5–7) The post-conviction court denied the claim as follows (Doc. 10-7 at 5–9) (state court record citations omitted):

> . . . Defendant asserts counsel was ineffective for failing to move to suppress Defendant's statements to law enforcement. Defendant asserts his first counsel filed a motion to suppress and his new trial counsel was aware of the filed motion, but failed to file his own motion or [request] a hearing on any motion to suppress. Defendant attaches a copy of the motion to suppress filed and Defendant essentially tracks the same facts and arguments raised in the motion to suppress, including that his statements were obtained in violation of *Miranda* and his statements were elicited in the absence of counsel after Defendant had invoked his right to counsel. Defendant further contends counsel should have moved to suppress his statements on the basis that law enforcement used improper and deliberate tactics to delay administration of *Miranda* warnings and that he was in custody for *Miranda* purposes. Defendant asserts he was prejudiced where the State relied on his statements to corroborate the physical evidence at trial. Defendant alleges that if counsel had moved to suppress his statements, those statements would have been suppressed and the result of the proceedings would have been different.
>
> During the October 4, 2017, evidentiary hearing, Defendant presented the testimony of Sergeant Brian Trlak and Detective Anna Richardson. Sergeant Trlak recalled that Defendant was arrested on November 13, 2010, for a burglary that occurred on East Powhatan Avenue on October 11, 2010. Sergeant Trlak testified that he interviewed Defendant at the jail on December 1, 2010, but he was not aware the Office of the Public Defender had been appointed to represent Defendant or that Defendant had signed an invocation of rights form at his first appearance on November 14, 2010. Defendant told Sergeant Trlak he did not have an attorney, and Defendant declined to sign the waiver of rights form and to speak with Sergeant Trlak. Sergeant Trlak testified that at the time of the December 1, 2010, interview, he was not aware of a pending investigation into the instant October 12, 2010, burglary that occurred at a residence on North Bay Street. On December 15, 2010, Detective Anna Richardson contacted Sergeant Trlak regarding a possible lead in his case

based on her investigation of the instant burglary on North Bay Street, and they interviewed Defendant at the District Three office after his arrest that day. Sergeant Trlak testified Detective Richardson initiated the interview and tried to explain to Defendant why he was arrested and read him *Miranda* warnings, but Defendant "kept interjecting" with statements that he was a scrapper and sold scrap metal, and he knew it was wrong to go into abandoned houses; Defendant then invoked his right to counsel. The interview on December 15, 2010, was only in reference to Detective Richardson's North Bay Street burglary investigation.

Detective Richardson testified that on October 19, 2010, she began investigating the instant burglary, which occurred at a house on North Bay Street on October 12, 2010. Blood and skin tissue were found on a broken window at the North Bay Street house and collected and, on December 14, 2010, Detective Richardson received the DNA results for the blood and tissue samples; the CODIS results indicated the DNA belonged to Defendant, so Detective Richardson issued a pick-up order or arrest affidavit for Defendant. Defendant was arrested on December 15, 2010, and that same day, she and Sergeant Trlak interviewed Defendant at the District Three office. Detective Richardson only had information on her case and was not aware Defendant had been arrested on November 14, 2010 for the Powhatan Avenue burglary, or that Defendant signed an invocation of rights form or that the Office of the Public Defender was appointed to represent him in the Powhatan burglary case; she testified that she was aware only that Defendant had not been previously arrested in the instant North Bay Street burglary case [and] therefore he would not have had a Public Defender in the instant case. Detective Richardson testified that at the outset of the interrogation she tried numerous times to read *Miranda* warnings to Defendant, but he kept interrupting her with spontaneous statements until he finally asked for an attorney; Defendant stated that he heard voices, he was a "scrapper" and he knew it was wrong to go into abandoned houses. She only attempted to administer *Miranda* warnings to Defendant, and she did not ask him any questions. Once Defendant asked for a lawyer, Detective Richardson photographed some scars on Defendant's arm and escorted him back to the jail cell.

During the October 4, 2017, evidentiary hearing, Defendant also presented the testimony of trial counsel, Joseph Caimano, Esquire. Mr. Caimano testified that he represented Defendant in

the instant case and he received the case file from Defendant's prior counsel, the Office of [the] Public Defender. Mr. Caimano did not recall and did not have any notes indicating Defendant told him of any facts different than what was included in the police reports. Mr. Caimano further testified he was aware the previous attorney had filed a motion to suppress on May 19, 2011, and he could adopt that motion, but Mr. Caimano decided not to do so because he conducted his own research and determined the motion was legally insufficient.

During the October 4, 2017, evidentiary hearing, Defendant testified that Detective Richardson made no attempt to read him *Miranda* warnings. He testified that Detective Richardson first asked him what he did for a living, and he responded that he was a scrapper and picked up and sold scrap; she further told him that he went into abandoned houses to take scrap and sell it, but he told her it was wrong to go into abandoned houses, and then invoked his right to counsel. Defendant further testified that he and Mr. Caimano discussed the motion to suppress, and Mr. Caimano told him it was a good motion and he would consider it; Defendant tried to talk to Mr. Caimano about the motion, but he told Defendant to stop listening to the jailhouse lawyers.

After considering Defendant's motion, the State's response, the court file and record, as well as the testimony and evidence presented during the October 4, 2017, evidentiary hearing, and the written arguments of counsel[ ], the Court finds Defendant has failed to meet his burden under *Strickland*. The Court finds the testimony of Mr. Caimano to be credible. After Mr. Caimano reviewed the motion to suppress, conducted his own research and found the motion to be legally insufficient, he decided not to pursue the motion to suppress. Additionally, the Court finds the testimony of Sergeant Trlak and Detective Richardson to be credible. Defendant's arrest and subsequent invocation of rights and appointment of the Office of the Public Defender at his November 14, 2010, first appearance, and his December 1, 2010, refusal to speak with Sergeant Trlak or to sign the waiver of rights form all occurred in reference to the Powhatan Avenue burglary case and not the instant unrelated burglary; on November 14, 2010, and December 1, 2010, Defendant was not in custody, he was not interrogated[,] and interrogation was not imminent as to the instant offenses. *See Sapp v. State*, 690 So. 2d 581 (Fla. 1997) (finding a defendant may not effectively invoke the Fifth Amendment right to counsel under the federal constitution or the corresponding provision of the Florida Constitution until custodial interrogation has begun or is imminent). Defendant

> was not even on Detective Richardson's "radar" until she
> received the DNA report on December 14, 2010. Additionally,
> once Defendant was in custody and interrogated as to the instant
> offenses, Detective Richardson attempted to administer *Miranda*
> warnings to Defendant but he repeatedly interrupted and
> interjected with his own spontaneous statements. In light of the
> foregoing, the Court further finds the motion to suppress was
> meritless, and Mr. Caimano's determination that it was
> insufficient and his decision to not pursue it were reasonable. As
> such, the Court finds Defendant has failed to demonstrate
> counsel performed deficiently in failing to file or argue the
> motion to suppress or that he was prejudiced by counsel's failure
> to do so. No relief is warranted [ ].

The post-conviction court found trial counsel, Sergeant Trlak, and Detective Richardson credible at the evidentiary hearing (Doc. 10-7 at 8), and a state court's credibility determination receives deference in federal court. *Nejad v. Att'y Gen., State of Ga.*, 830 F.3d 1280, 1292 (11th Cir. 2016).

At the hearing, trial counsel testified that he entered an appearance in Mitchell's case, received the case file from the public defender's office, and knew that the public defender had filed a motion to suppress Mitchell's statements to police. (Doc. 10-7 at 83) Trial counsel learned that, on November 13, 2010, police arrested Mitchell for an unrelated burglary and the court appointed the public defender to represent Mitchell. (Doc. 10-6 at 83) He further learned that, on November 14, 2010, Mitchell signed an invocation of rights form in that unrelated burglary case, "invok[ing] his right to counsel for the current arrest and any other crimes under investigation." (Doc. 10-6 at 83)

Trial counsel confirmed that a police report indicated that, on December 1, 2010, police interrogated Mitchell about the unrelated burglary, and Mitchell invoked his right to counsel during the interrogation (Doc. 10-6 at 84–85):

| [3.850 counsel:] | Okay. Were you aware that Mr. Mitchell verbally invoked his right to counsel on that December 1st meeting? |
|---|---|
| [Trial counsel:] | If you want me to just read what is says here? I don't have an independent recollection of any of that. I'm just reading what this report says and I guess I can tell [ ] you what the report says. |
| [3.850 counsel:] | Does it indicate he invoked his right to counsel after *Miranda*? |
| [Trial counsel:] | Okay. So, um, reading this report it says, "I read him his rights. Asked him if he understood. He said that he did. He does not have an attorney and no one has spoken to him yet. He says he read the top again. And he says he could not sign this because he does not know anything about it, about any burglary. He said that he did not burglarize any place and then he says, um, that he would rather speak to an attorney first." |

Trial counsel further confirmed that he learned that, on December 15, 2010, police arrested Mitchell for the burglary in this case, transported Mitchell to the police station, and attempted to interrogate him. (Doc. 10-6 at 85) Trial counsel learned that the detective attempted to advise Mitchell of his constitutional rights but was unable to do so, and Mitchell made incriminating statements. (Doc. 10-6 at 85)

Trial counsel testified that he investigated the facts concerning the motion to suppress and learned that the state court released Mitchell on bond before police interrogated him on December 15, 2010 (Doc. 10-6 at 88) (bolding added):

| [3.850 counsel:] | Okay. So did you conduct any investigation before deciding not to proceed with the motion to suppress? |
|---|---|
| [Trial counsel:] | Investigation to what? |

| [3.850 counsel:] | Investigation into the facts of what happened? |
|---|---|
| [Trial counsel:] | Yes. So I looked at the invocation and **then he bonds out**, and then he is rearrested, and then they attempt to interview him on [an] unrelated issue. And that's — that's the facts as I understand them. . . . |

On redirect examination, trial counsel confirmed that the state court released

Mitchell on bond before police arrested and attempted to interrogate him a second time on

December 15, 2010 (Doc. 10-6 at 128–29) (bolding added):

| [3.850 counsel:] | Okay. . . . [W]hile you were doing your research with regard to the motion to suppress were you aware that as far as *Miranda* it's not offense specific. And once a person invokes their right to counsel with respect to one offense the police may not question the person regarding any offense until an attorney is present. |
|---|---|
| [Trial counsel:] | I think what I'm talking about was with respect to someone signing an invocation of rights form, **bonding out**[,] then being rearrested is my understanding. And an invocation [of] rights form from some earlier in time date would not have [been] controlling over a subsequent or intervening arrest at a later date. That's my understanding. |

Post-conviction counsel attempted to further establish a timeline through the

testimony of trial counsel (Doc. 10-6 at 129–30) (bolding added):

| [3.850 counsel:] | Okay. But were you aware there were two arrests. |
|---|---|
| [Trial counsel:] | Yes. |
| [3.850 counsel:] | So there was an arrest on November 13? |

| [Trial counsel:] | I mean, can you give me like the criminal report affidavits to just verify what dates you are talking about? |
|---|---|
| [Prosecutor:] | Judge, I have the print out from the arresting inquiry from, HCSO, if [the] defense wants to look at it. |
| [3.850 counsel:] | Okay. |
| [Prosecutor:] | Show[ing] booking in and book[ing] out dates to refresh his memory. |
| [3.850 counsel:] | So the first arrest was on November 13? |
| [Trial counsel:] | Yes. |
| [3.850 counsel:] | Okay. And then he was **bonded out** and then the second arrest was December 15? |
| [Trial counsel:] | **Yes.** |
| [3.850 counsel:] | Okay. So during that time between the first arrest and the second arrest while he was still in jail it was your understanding that Detective Trlak went to speak with him at the jail on December 1st and that's based on the police report? |
| [Trial counsel:] | I can't tell you what the dates are without them being in front of me. |
| [3.850 counsel:] | Okay. You want the police report back? |
| [Trial counsel:] | Sure. |
| [3.850 counsel:] | Okay. |
| [Prosecutor:] | Judge, I'm going to object to relevance. The conversation — |
| [Court:] | What is the relevance at this point? |
| [Prosecutor:] | The December 1st interview does not have any bearing on this case. |

18

| | |
|---|---|
| [3.850 counsel:] | Well, we would submit it's the crux of this particular issue, that arrest. But the relevance is because he's indicating based on *Sapp v. State*, and we're talking about the invocation of rights form. And so I'm making sure that he was aware that there was an intervening thing. So there was the invocation of rights form that was signed on November 14th. Then [ ] Detective Trlak came to the jail to talk with him on December the 1st. And then that's when *Miranda* was read and he invoked. That's what we went through earlier with the police report. I'm just confirming that you are aware of that in light of the State's question. |
| [Court:] | Well if it's been asked and answered let's move on. |

Trial counsel agreed that he could have adopted the motion filed by the public defender but did not because he "didn't think that [it] was legally sufficient to suppress the statements that were spontaneous statements made in the subsequent arrest that was not related to his initial arrest." (Doc. 10-7 at 88–89) After conducting research, trial counsel concluded that the invocation of rights in the unrelated case would not have justified suppression of Mitchell's statements concerning the burglary in this case. (Doc. 10-7 at 89–90)

Sergeant Trlak testified that, on November 13, 2010, he arrested Mitchell for the unrelated burglary. (Doc. 10-7 at 42–43) On December 1, 2013, the sergeant went to the jail to interrogate Mitchell about the unrelated burglary. (Doc. 10-7 at 43) The sergeant denied knowing that the public defender represented Mitchell in the unrelated burglary case. (Doc. 10-7 at 43) The sergeant advised Mitchell of his constitutional rights, Mitchell asked to speak with a lawyer, and the sergeant terminated the interview. (Doc. 10-7 at 45–46)

On December 15, 2010, after learning from Detective Richardson that police arrested Mitchell for the second burglary in this case, Sergeant Trlak went to the police station to assist the detective with the interrogation of Mitchell about the new burglary. (Doc. 10-7 at 48–50) The sergeant described the conversation as: "Well, the conversation was more one sided on his part. We attempted to speak to him and **inform him what we were doing and he was proceeding to give us information or speak to us**. We then repeatedly attempted to try to read him his *Miranda* to answer questions but he kept interjecting with those responses." (Doc. 10-7 at 51–52) (bolding added) Mitchell volunteered that he knew that he wrongly went into abandoned houses but never admitted to committing the burglary in this case. (Doc. 10-7 at 52–53) When Detective Richardson started to read the *Miranda* rights again, Mitchell invoked his right to an attorney. (Doc. 10-7 at 53)

Detective Richardson testified that, on December 14, 2010, she signed an affidavit for Mitchell's arrest and told two police officers to find Mitchell, arrest him, and bring him to the police station. (Doc. 10-6 at 55–56) The detective further testified that, on December 15, 2010, she attempted to interrogate Mitchell and was unaware that the public defender represented Mitchell in the unrelated burglary case or that Mitchell had signed an invocation of rights form in that unrelated case. (Doc. 10-7 at 58–59) The detective began reading Mitchell his constitutional rights from a card. (Doc. 10-7 at 61–62) Mitchell interrupted the detective three or four times. (Doc. 10-7 at 62) Mitchell volunteered that he scrapped metal and earned a hundred dollars a truckload. (Doc. 10-7 at 62–63) He also said that "he knew it was wrong to break into abandos," or abandoned houses. (Doc. 10-7 at 67–68)

The detective described the interrogation as follows (Doc. 10-7 at 63–64) (bolding added):

[3.850 counsel:]   Okay. Tell me — okay, so you said you came in. You started *Miranda*. Were you reading from a card or the form?

[Detective:]   TPD Form 310.

[3.850 counsel:]   Okay. So as you're telling him I need to read you your *Miranda*, did you have the form up and were you starting to read the first line on the form?

[Detective:]   Yes.

[3.850 counsel:]   And was that when he interrupted the first time?

[Detective:]   He interrupted, I don't know where, which part, how far I got into it, but he interrupted me the first time.

[3.850 counsel:]   And then he said what when he interrupted the first time?

[Detective:]   Something about hearing voices.

[3.850 counsel:]   Okay. And then what did you say?

[Detective:]   I told him let me finish reading *Miranda*. And don't quote me directly, but paraphrased something to the effect, I need to finish reading *Miranda*, and then we could hear what you have to say.

He interrupted a second time. I again told him, let me get through this and I'd love to hear your side of the story. He interrupted us a third time I believe, [and] that's when he talked about the scrapping. Um, and I said, you need to get through this. **Do you understand what you're being arrested for? We've got two burglaries with DNA and, um, DNA evidence and I guess Trlak had a witness ID** and at that point he lawyered up.

21

| | |
|---|---|
| [3.850 counsel:] | He lawyered up. So is that when he said you're smarter than me? |
| [Detective:] | Yes, something to the effect of, you're smarter than me and I think at this point I should get a lawyer. |

The detective denied asking Mitchell any questions about the robbery in this case. (Doc. 10-7 at 69)

Two police officers testified that, on December 15, 2010, they arrested Mitchell just outside his home for the burglary in this case. (Doc. 10-6 at 71–73, 77–78) The police officers drove Mitchell to the police station where the detectives planned to talk to him about the case. (Doc. 10-6 at 74–75, 79–80) In a motion to revoke bond in this burglary case, the prosecutor represented that "[Mitchell] was released on December 12, 2010 with $7,500.00 bond" in the unrelated case. (Doc. 10-2 at 26)

The state court unreasonably applied *Strickland*, *Edwards v. Arizona*, 451 U.S. 477 (1981), and *Maryland v. Shatzer*, 559 U.S. 98 (2010) by concluding that Mitchell "failed to demonstrate counsel performed deficiently in failing to file or argue the motion to suppress . . . ." (Doc. 10-7 at 9) *Miranda*, 384 U.S. at 444, holds that "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." Before any questioning, the defendant must be informed that he has the right to remain silent, his statement can be used as evidence against him, and he has the right to have a retained or appointed attorney present. *Miranda*, 384 U.S. at 444–45. If the defendant indicates that he wants to consult an attorney, police may not question him. *Miranda*, 384 U.S. at 444–45.

*Edwards v. Arizona*, 451 U.S. 477, 484 (1981), extends the protections under *Miranda* and holds: "[W]hen an accused has invoked his right to have counsel present during custodial interrogation, a valid waiver of that right cannot be established by showing only that he responded to further police-initiated custodial interrogation even if he has been advised of his rights." *Edwards*, 451 U.S. at 484, further requires that "an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."

"The *Edwards* rule . . . is not offense specific: Once a suspect invokes the *Miranda* right to counsel for interrogation regarding one offense, he may not be reapproached regarding any offense unless counsel is present." *McNeil v. Wisconsin*, 501 U.S. 171, 177 (1991). *Edwards* applies even if a law enforcement officer from a different investigative agency approaches a defendant to discuss a different crime. *Arizona v. Roberson*, 486 U.S. 675, 682 (1988) ("Petitioner contends that the bright-line, prophylactic *Edwards* rule should not apply when the police-initiated interrogation following a suspect's request for counsel occurs in the context of a separate investigation. . . . We are unpersuaded."). Whether the police officer who is conducting the second investigation knows that the defendant invoked his right to counsel during the earlier interrogation is not relevant. *Roberson*, 486 U.S. at 687 ("[W]e attach no significance to the fact that the officer who conducted the second interrogation did not know that respondent had made a request for counsel.").

*Maryland v. Shatzer*, 559 U.S. 98, 110 (2010), holds that the *Edwards* rule extends to a defendant who invokes his right to counsel during a custodial interrogation, secures release on bond, and faces rearrest and interrogation concerning a new offense shortly after. *Shatzer*

requires a fourteen-day break in custody before police can approach and interrogate a defendant concerning the new offense. *Shatzer*, 559 U.S. at 110 ("We think it appropriate to specify a period of time to avoid the consequence that continuation of the *Edwards* presumption 'will not reach the correct result most of the time.' It seems to us that period is 14 days. That provides plenty of time for the suspect to get reacclimated to his normal life, to consult with friends and counsel, and to shake off any residual coercive effects of his prior custody.") (citation omitted).

Sergeant Trlak testified that, on December 1, 2010, Mitchell invoked his right to counsel during a custodial interrogation concerning an unrelated offense. (Doc. 10-7 at 43, 45–46) Trial counsel testified that Mitchell secured release on bond in the unrelated case. (Doc. 10-6 at 88, 128–30) In the motion to revoke bond, the prosecutor represented that Mitchell secured release on December 12, 2010. (Doc. 10-2 at 26) On December 15, 2010, two police officers arrested Mitchell at his home and brought him to the police station for an interrogation. (Doc. 10-6 at 71–75, 77–80) Even though Mitchell had invoked his right to counsel, Sergeant Trlak and Detective Richardson arrested Mitchell, placed him in an interrogation room, and attempted to interrogate him three days after his release on bond and on the fourteenth day after his invocation of his right to counsel. *Accord* Fed. R. Crim. P. 45(a)(1)(A) ("When the period is stated in days or a longer unit of time: . . . exclude the day of the event that triggers the period . . . .").

*Edwards* and *Shatzer* prohibited the sergeant and the detective from approaching Mitchell for further interrogation without counsel present. *McNeil*, 501 U.S. at 176–77 ("In *Edwards v. Arizona*[ ], we established a second layer of prophylaxis for the *Miranda* right to counsel: Once a suspect asserts the right, not only must the current interrogation cease, but

**he may not be approached for further interrogation** 'until counsel has been made available to him,' [ ]—which means, we have most recently held, that counsel must be present, *Minnick v. Mississippi*, 498 U.S. 146 (1990).") (bolding added); *Shatzer*, 559 U.S. at 105 ("The *Edwards* presumption of involuntariness ensures that police will not take advantage of the mounting coercive pressures of 'prolonged police custody,' by repeatedly **attempting to question a suspect** who previously requested counsel until the suspect is 'badgered into submission.'") (citations omitted) (bolding added).

Because the sergeant and the detective initiated the encounter without counsel present, after Mitchell invoked his right to counsel, the state court should have presumed Mitchell's statements involuntary and suppressed them at trial. *McNeil*, 501 U.S. at 177 ("If the police do **subsequently initiate an encounter** in the absence of counsel (assuming there has been no break in custody), the suspect's statements are presumed involuntary and therefore inadmissible as substantive evidence at trial, even where the suspect executes a waiver and his statements would be considered voluntary under traditional standards.") (bolding added).

Because the sergeant and the detective approached Mitchell without waiting fourteen days after Mitchell's release from custody and attempted to initiate a new interrogation without counsel present, the state court unreasonably applied *Edwards* and *Shatzer*. Also, because the motion to suppress Mitchell would have succeeded, the state court unreasonably applied *Strickland*. (Doc. 10-7 at 9) *Kimmelman v. Morrison*, 477 U.S. 365, 375 (1986). Consequently, this Court reviews the claim *de novo. McGahee v. Ala. Dep't Corrs.*, 560 F.3d 1252, 1266 (11th Cir. 2009) ("Where we have determined that a state court decision is an unreasonable application of federal law under 28 U.S.C. § 2254(d), we are unconstrained by § 2254's deference and must undertake a *de novo* review of the record.").

Even under the less deferential *de novo* review, Mitchell is not entitled to relief. Mitchell could not demonstrate a reasonable probability that the outcome at trial would have changed if trial counsel had filed the meritorious motion. *Kimmelman*, 477 U.S. at 375. Had Mitchell proceeded to trial with his confession suppressed, he would have proceeded as many do, having invoked their right to silence. The jury would have been left to consider the physical and circumstantial evidence against him without the benefit of even a partial confession. That evidence was overwhelming.

Substantial, unrefuted evidence at trial proved Mitchell's guilt even without Mitchell's statements. The evidence proved that a maintenance supervisor found copper removed from the empty house. (Doc. 10-2 at 327–28, 338, 341–42) A window in the rear of the house was broken, and a screen for the window was lying on the ground. (Doc. 10-2 at 326, 336) DNA from blood on the outside part of the window and a fleshy substance on the inside part of the window matched Mitchell's DNA. (Doc. 10-2 at 394–96, 400) A detective observed scrapes and scars on Mitchell's arms. (Doc. 10-2 at 410–12)[2] A crime laboratory analyst testified that frequency of occurrence for the DNA results was "for Caucasians [ ] one in six hundred and ten quadrillion, for African Americans one in eight hundred and fifty trillion, and Southeastern Hispanics, one in two hundred and sixty quadrillion." (Doc. 10-2 at 400) Mitchell is African American. (Doc. 10-2 at 17)

The information charged Mitchell with "unlawfully enter[ing] or remain[ing] in a certain dwelling, the property of Gabrielle Homes, with intent to commit an offense therein."

_____

[2] *Shatzer* barred the detective from interrogating Mitchell. However, the detective was within his authority to arrest Mitchell based on the probable cause affidavit for the burglary and, therefore, could lawfully observed the scars on his arms because the observations were not reasonably likely to elicit an incriminating response. *See Schmerber v California*, 384 U.S. 757, 764 (1966); *Rhode Island v. Innis*, 446 U.S. 291, 301–02 (1980).

(Doc. 10-2 at 103) The Florida legislature removed the common law elements of burglary requiring a "breaking" and an "intent to commit a felony" and expanded the definition of a "dwelling" to include the curtilage. *Baker*, 636 So. 2d at 1343–44; *Toole v. State*, 472 So. 2d 1174, 1176 (Fla. 1985) (citation omitted). "[B]eyond allegation and proof of unauthorized entry or remaining in a structure or conveyance, the essential element to be alleged and proven on a charge of burglary is the intent to commit an offense, **not the intent to commit a specified offense**, therein." *Toole*, 472 So. 2d at 1175 (bolding added).

A five or six-foot high chain linked fence enclosed the backyard of the house (Doc. 10-2 at 331–32), and the broken window was in the rear of the house. (Doc. 10-2 at 327) Mitchell's DNA was found on the broken window. (Doc. 10-2 at 394–96, 400) The unrefuted evidence proved that Mitchell entered the curtilage of the house with the intent to commit, at the very least, a criminal mischief by breaking the window. *Baker*, 636 So. 2d at 1343–44 ("The burglar no longer need intend to commit a felony; the intention to commit any offense, even criminal mischief, is sufficient to satisfy this element of the present statutory crime.") ("Baker entered Wilson's yard which was protected by a fence and shrubbery where the owner had an expectation of privacy. Even though he did not enter Wilson's house, he did enter Wilson's 'dwelling.'").

Mitchell did not confess that he committed the burglary charged in the information. He instead admitted to generally stealing scrap metal from abandoned houses. (Doc. 10-2 at 408–09, 418–19, 422) In the face of the significant evidence of his guilt, the Court finds that Mitchell cannot demonstrate that these limited statements were necessary to establish his guilt and that a reasonable probability exists that the outcome at trial would have changed if the trial court had suppressed these statements. Accordingly, Mitchell is not entitled to relief.

*Strickland*, 466 U.S. at 695 ("When a defendant challenges a conviction, the question is whether there is a reasonable probability that, absent the errors, the factfinder would have had a reasonable doubt respecting guilt. . . .  In making this determination, a court hearing an ineffectiveness claim must consider the totality of the evidence before the judge or jury."); *Richter*, 562 U.S. at 112 ("The likelihood of a different result must be substantial, not just conceivable."). *Thompson v. Vanihel*, 998 F.3d 762, 768 (7th Cir. 2021) ("We agree with the district court that the evidence against Thompson was 'overwhelming.' Viewed as a whole, it is not substantially likely that the result of Thompson's trial would have been different but for the errors he identifies."); *Hawkins v. Hannigan*, 185 F.3d 1146, 1161 (10th Cir. 1999) ("We conclude that, in light of this evidence properly admitted at trial, Hawkins has not shown a reasonable probability that, absent the videotape containing his outright admission that he sexually assaulted the victim, the jury's verdict would have been different.").

Ground Two is **DENIED**.

**Ground Three**

Mitchell asserts that trial counsel was ineffective for not independently testing the red and fleshy substances for DNA ("sub-claim A") and for not arguing that police failed to have a second analyst review the results of the DNA testing ("sub-claim B"). (Doc. 1 at 8–9)

**Sub-claim A**

Mitchell asserts that trial counsel was ineffective for not independently testing the red and fleshy substances found on the broken window for DNA. (Doc. 1 at 8–9) The post-conviction court denied the claim as follows (Doc. 10-7 at 9–11) (state court record citations omitted):

. . . Defendant asserts counsel was ineffective in failing to obtain an independent DNA test. Defendant contends he asked counsel to request an independent test but counsel refused. Defendant claims the State's DNA test results were not a "direct match" and were "weak and rounded-off to match." Defendant asserts that if counsel had obtained an independent DNA test, the results would have been different and raised reasonable doubt at trial.

During the October 4, 2017, evidentiary hearing Mr. Caimano testified that he did not speak to any independent labs about retesting the blood or flesh samples taken from the window frame because Defendant had already confirmed to him that he broke into the house to steal copper and cut his arm on the window while he was breaking into the house. Mr. Caimano testified that he did not think it was beneficial to the defense to have another lab confirm the evidence contained Defendant's DNA.

During the October 4, 2017, evidentiary hearing, Defendant testified that he and Mr. Caimano talked about FDLE's DNA results that were not a direct match and finding of fingerprints that were not Defendant's; he wanted Mr. Caimano to obtain an independent DNA test but counsel did not obtain one. Defendant testified that he cut his finger after reaching through a pre-existing hole in the window and he was moving aside the blinds to look inside the house that was for sale; he never told Mr. Caimano that he broke into the house or stole anything.

After considering Defendant's motion, the State's response, the court file and record, as well as the testimony and evidence presented during the October 4, 2017, evidentiary hearing, and the written arguments of counsel[ ], the Court finds Defendant has failed to meet his burden under *Strickland*. The Court finds the testimony of Mr. Caimano to be more credible than that of Defendant. The Court finds Defendant told Mr. Caimano that he committed the instant burglary and cut his arm on the window while breaking into the house[.] [T]herefore, the Court further finds reasonable Mr. Caimano's decision to not obtain an independent DNA test. Additionally, the Court notes that at the evidentiary hearing, although Defendant denied admitting to Mr. Caimano that he committed the instant burglary, Defendant testified he cut himself on the window while peering through the broken window. Consequently, Defendant has failed to present[ ] any evidence that the result of the proceedings would have been different had counsel obtained an

independent DNA test. The Court finds Defendant has failed to show that counsel performed deficiently by failing to obtain an independent DNA test, or that he was prejudiced by counsel's failure to do so. No relief is warranted [ ].

The post-conviction court found trial counsel more credible than Mitchell at the evidentiary hearing (Doc. 10-7 at 10), and a state court's credibility determination receives deference in federal court. *Nejad*, 830 F.3d at 1292.

At the hearing, trial counsel testified that he did not independently test the red and fleshy substances for DNA because Mitchell told trial counsel that he broke into the house and stole the copper wire. (Doc. 10-7 at 91–92) Trial counsel testified that "I think he had shown me exactly where he was cut." (Doc. 10-7 at 97) Mitchell testified that he went to the house because a realtor invited him, and he cut his finger on the broken window when he lifted the blinds to look inside the house. (Doc. 10-7 at 151–53) Mitchell failed to present evidence that additional testing by the defense would have shown that his DNA did not match the DNA from the red and fleshy substances.

At trial, the crime laboratory analyst testified that DNA from the red substance, fleshy substance, and Mitchell all had "the same profile" and "matched." (Doc. 10-2 at 394–96) The analyst explained: "For the slab on the window frame and the flakes from the broken window, for Caucasians [the frequency of occurrence] was one in six hundred and ten quadrillion, for African Americans one in eight hundred and fifty trillion, and Southeastern Hispanics, one in two hundred and sixty quadrillion." (Doc. 10-2 at 400)

Because reasonable trial counsel would not have conducted additional testing under these circumstances and Mitchell failed to show that the outcome at trial would have changed, the state court did not unreasonably apply *Strickland*. *Brownlee v. Haley*, 306 F.3d 1043, 1060 (11th Cir. 2002) ("As we have explained, '[s]peculation is insufficient to carry

the burden of a habeas corpus petitioner as to what evidence could have been revealed by further investigation.'") (quoting *Aldrich v. Wainwright*, 777 F.2d 630, 636 (11th Cir. 1985)).

Sub-claim A is **DENIED**.

**Sub-claim B**

Mitchell asserts that trial counsel was ineffective for not arguing that the police failed to have a second analyst review the results of the DNA testing. (Doc. 1 at 8–9) The post-conviction court denied the claim as follows (Doc. 10-7 at 11–12) (state court record citations omitted):

> . . . Defendant alleges counsel was ineffective for failing to object to and challenge the validity of the State's DNA testing procedures and results. Defendant alleges that generally accepted standards require an independent review of a DNA analyst's work or a second test. Defendant further asserts no review or second DNA test was conducted in this case, [and] therefore, the results were inadmissible under *Frye*.[4] Defendant asserts he was prejudiced where the DNA test results were the "sole basis for probable [ ] cause to arrest and for Defendant's conviction."
>
> ⁴ *Frye v. U.S.*, 293 F. 1013 (D.C. Cir. 1923).
>
> During the October 4, 2017, evidentiary hearing, Mr. Caimano testified that he considered challenging the admissibility of the FDLE results, but he "didn't see anything that was inappropriately done in the discovery."
>
> During the October 4, 2017, evidentiary hearing, Defendant did not present any testimony or evidence to support his allegations that only one test was conducted or that the testing procedure or results here would have been inadmissible under *Frye* or otherwise.
>
> After considering Defendant's motion, the State's response, the court file and record, as well as the testimony and evidence presented during the October 4, 2017, evidentiary hearing, and the written arguments of counsel[ ], the Court finds Defendant has failed to meet his burden under *Strickland*. The Court finds Defendant has failed to demonstrate counsel performed

deficiently in failing to request a *Frye* hearing or challenge the admissibility of the DNA evidence, or that he was prejudiced by counsel's failure to do so. No relief is warranted [ ].

Whether the trial court would have admitted the expert's testimony under *Frye* and the state rules of evidence is an issue of state law, and a state court's determination of state law receives deference in federal court. *Machin v. Wainwright*, 758 F.2d 1431, 1433 (11th Cir. 1985).

At the evidentiary hearing, trial counsel testified that he considered challenging the admissibility of the DNA results but "didn't see anything that was inappropriately done in the discovery." (Doc. 10-7 at 97) Mitchell's trial occurred in 2012 (Doc. 10-2 at 213), and *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), applied to the admission of expert testimony. *DeLisle v. Crane Co.*, 258 So. 3d 1219, 1227 (Fla. 2018) ("Following our repeated affirmations of the *Frye* rule, in 2013 the Legislature amended section 90.702 to incorporate *Daubert* in the Florida Rules of Evidence.").

At trial, the crime laboratory analyst testified that she participated in training for serology, which included reading peer reviewed literature, practicing on samples, and working under a trained analyst on cases. (Doc. 10-2 at 386–87) The crime laboratory where the analyst worked was accredited by the American Society of Crime Laboratory Directors Accrediting Board, which required participation in proficiency testing and inspection to ensure that the laboratory met requirements. (Doc. 10-2 at 387) The analyst performed short tandem repeats testing, the most widely used type of testing since the 1990s. (Doc. 10-2 at 388) The analyst implemented controls during testing to ensure the reliability of both the chemicals and the instruments used for testing. (Doc. 10-2 at 388) The analyst also took

steps to ensure that the DNA evidence was kept in a secure locker and to ensure that her testing area and tools were clean before testing. (Doc. 10-2 at 390–91)

Mitchell presented no expert testimony or other evidence to demonstrate that these testing procedures or the absence of additional testing by a second expert ran afoul of *Frye*; consequently, the state court did not unreasonably deny the claim. (Doc. 10-9 at 57–58) *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) ("*Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different."). *Overton v. State*, 976 So. 2d 536, 553 (Fla. 2007) ("Bever testified that the following protocols and procedures were in place at the Bode Lab when the testing for the MacIvor murders occurred: (1) Bode Lab had a quality assurance program in place; (2) Bode Lab was accredited; and (3) accreditation was based on the lab meeting certain guidelines. From this testimony, the Bode Lab followed accepted testing procedures that meet the *Frye* test to protect against false readings and contamination.").

In his post-conviction motion and his brief filed after the hearing, Mitchell argued that if trial counsel had moved to exclude the DNA evidence based on *Murray v. State*, 838 So. 2d 1073 (Fla. 2002), the trial court would have granted the motion. (Docs. 10-3 at 25–27 and 10-9 at 57–58) *Murray* is distinguishable.

In *Murray*, an analyst for law enforcement tested a sample of hair for DNA and concluded that results were inconclusive "because the faint alleles were too faint and ambiguous to be interpreted decisively," while his supervisor disagreed and concluded the results were conclusive. *Murray*, 838 So. 2d at 1080. The analyst failed to document the required controls for testing, used the entire sample during testing preventing the defense from conducting its own testing, and engaged in "general sloppiness in documenting the

tests which even the analyst admitted was below the standards normally accepted." *Murray*, 838 So. 2d at 1081. The court concluded that: "Based on the unique combination of errors and problems which occurred in the tests and the lack of documentation, we find that the State did not meet its burden in demonstrating the general acceptance of the testing procedures which were used in this case." Murray, 838 So. 2d at 1081. Mitchell failed to show that the same unique combination of errors and problems arose in his case.

A decade after the 1999 trial in *Murray*, when Mitchell's 2012 trial occurred, the PCR method of DNA testing that was used was generally accepted by the scientific community and no longer subjected to *Frye* testing. *Zack v. State*, 911 So. 2d 1190, 1198 n.3 (Fla. 2005) ("Although PCR DNA testing was still being challenged in September and October 1997, when this case was tried, the PCR method of DNA testing is now generally accepted by the scientific community and is not subjected to *Frye* testing.") (citing *Lemour v. State*, 802 So. 2d 402, 404–05 (Fla. 3d DCA 2001)). Because an objection to the expert's opinion testimony would not have succeeded, the state court did not unreasonably apply *Strickland*. *Allen v. Sec'y, Fla. Dep't Corrs.*, 611 F.3d 740, 754 (11th Cir. 2010) ("While PCR DNA testing was novel at the time of Allen's trial, the Florida Supreme Court has since determined that it clears the *Frye* hurdle. Because of those legal developments, Allen cannot establish *Strickland*-type prejudice from his counsel's failure to request a *Frye* hearing.") (citations omitted).

Sub-claim B is **DENIED**.

Ground Three is **DENIED**.

**Ground Four**

Mitchell asserts that trial counsel was ineffective for not arguing to the jury that Mitchell went to the house owned by the property management company because he was interested in purchasing the house. (Doc. 1 at 11) The post-conviction court denied the claim as follows (Doc. 10-7 at 12–15) (state court record citations omitted):

> . . . Defendant asserts counsel was ineffective for failing to present Defendant's reasonable hypothesis of innocence explaining his presence at the crime scene. Specifically, Defendant asserts he told counsel that his DNA was found at the burglarized house because he had been there previously. Defendant contends the burglarized house was for sale and open to the public; Defendant contacted the realtor, who told him to look around outside and if he was still interested, she would show him the inside of the house at another time. Defendant then looked around the house, and while looking through one of the windows that was partially broken, he put his hands on the window. Defendant claims he was arrested and charged solely based on his DNA match to the DNA found on the window. Defendant further claims counsel told him he did not have time to hear Defendant's explanation and that it was the State's burden to prove the allegations. Defendant further contends counsel refused to look into his defense and told him his felony record would come out if he testified. Defendant alleges counsel acted against his wishes and counsel's strategy was unreasonable in light of this "extremely viable defense to all charged crimes" because there was no evidence to refute this valid defense. Defendant asserts his valid defense would have entitled him to a dismissal or not guilty verdict.
>
> During the October 4, 2017, evidentiary hearing Mr. Caimano testified that Defendant admitted to him that he broke into the house to steal copper and he cut his arm on the window while he was breaking into the house. Mr. Caimano recalled Defendant may have advised him there was more opportunity to get an air conditioner unit or copper wiring by breaking into vacant houses or houses for sale. Mr. Caimano testified Defendant did not tell him he was only viewing the house as it was for sale, and Defendant did not give him the name or phone number of the realtor, Dianne Hart; Defendant did not tell him he contacted Ms. Hart or that she advised him to go ahead and

look around the house first and to contact her if he still wanted to see the inside of the house. Mr. Caimano further testified Defendant did not tell him the window of the house was already broken or that Defendant cut his hand as he reached through the broken window only to move the blinds aside so he could see the inside of the house. If Defendant had told him anything about being on the property legally, he would have further investigated, but Defendant never told him anything to that effect.

Based on his conversation with Defendant, Mr. Caimano stated he did not have any evidence of a legal reason or other reasonable hypothesis of innocence to explain Defendant's presence in the house. Mr. Caimano testified that the theory of defense was that "the State could not prove beyond a reasonable doubt that he had broken into the house with the intent to commit a crime." He and Defendant discussed this theory of defense, and Defendant requested that Mr. Caimano see if they could get less prison time or fifteen years in prison without the PRR designation. He and Defendant discussed whether Defendant should testify, and that in light of Defendant's admission that he committed the offenses and because Defendant could not truthfully testify to a valid defense, Defendant should not testify. Defendant did not tell Mr. Caimano he wanted to testify and Mr. Caimano did not tell Defendant they did not need to call any witnesses because the State could not prove its case.

During the October 4, 2017, evidentiary hearing, Defendant testified that he told Mr. Caimano the following: Defendant called Ms. Hart to look at the house, and she told him "to go ahead and take a look at it and give her a call back" to look inside; Defendant then went to the house and looked around; he went around the back of the house, and saw a window with mission blinds and the window [ ] already had a hole in it; he lifted up the blinds and peeked through the hole to see inside the house and cut his finger; he then left. Defendant testified that he did not enter the house nor take an AC unit or any copper, and he never returned to the house. Defendant testified that he never told Mr. Caimano he broke into the house or stole anything. Defendant further testified that he told Mr. Caimano he wanted him to call Ms. Hart as a witness, but Mr. Caimano said they did not need to call any witnesses and the State could not prove its case. Defendant testified that he told Mr. Caimano he wanted to testify to explain why his DNA [was] at the scene, but Mr. Caimano told him "no" because the State would "eat

[him] alive," and once the State asked him about the number of his prior felony convictions, the jury would not find him innocent.

A review of the record reflects Defendant advised the trial court that he was choosing not to testify, and he [ ] responded in the affirmative after the trial court asked him if he made his decision "freely and voluntarily, of your own free will."

After considering Defendant's motion, the State's response, the court file and record, as well as the testimony and evidence presented during the October 4, 2017, evidentiary hearing, and the written arguments of counsel[ ], the Court finds Defendant has failed to meet his burden under *Strickland*. The Court finds the testimony of Mr. Caimano to be more credible than that of Defendant. The Court finds Defendant told Mr. Caimano he committed the instant offenses and broke into the house and stole the copper wiring and air conditioning unit. Defendant did not tell Mr. Caimano he was only looking at the house that was for sale, or that he contacted the realtor, Ms. Hart, or that she instructed him to look around; Defendant did not tell Mr. Caimano he cut his hand only after sticking his hand through a pre-existing hole in the window or that he was only moving the blinds aside so he could see inside the house. Defendant did not tell Mr. Caimano he wanted to testify [so that] [he] could provide [an] explanation [for] the presence of his DNA. Mr. Caimano did not prohibit Defendant from testifying nor did he tell Defendant they did not need to call any witnesses because the State could not prove its case. Mr. Caimano and Defendant discussed their trial strategy or theory of defense, specifically, to argue that the State had failed to prove the elements of burglary. In light of Defendant's admissions to counsel, Mr. Caimano's trial strategy was reasonable as was his advice that Defendant not testify. Based on the foregoing, the Court finds Defendant has failed to demonstrate that counsel performed deficiently under *Strickland*. No relief is warranted [ ].

The post-conviction court found trial counsel more credible than Mitchell at the evidentiary hearing (Doc. 10-7 at 15), and a state court's credibility determination receives deference in federal court. *Nejad*, 830 F.3d at 1292.

At the hearing, trial counsel testified that Mitchell admitted to him that he broke into the house to steal copper wiring. (Doc. 10-7 at 92) Trial counsel did not remember Mitchell

explaining that the house was for sale, that Mitchell had contacted the realtor, or that the realtor had invited Mitchell to look at the house. (Doc. 10-7 at 93–94, 128) Mitchell did not explain that the window was broken when Mitchell arrived at the house and did not explain that Mitchell cut his arm when he reached through the broken window to move blinds. (Doc. 10-7 at 95–96) The trial court found Mitchell indigent for costs, and Mitchell never represented that he could have afforded to purchase a house. (Doc. 10-7 at 118, 128) Trial counsel discussed with Mitchell the theory of defense and advised Mitchell not testify because he admitted to breaking into the house. (Doc. 10-7 at 99–100) Mitchell never told trial counsel that he wanted to testify, and trial counsel never told Mitchell not to testify because the prosecution could not prove the crime. (Doc. 10-7 at 126–27) Trial counsel knew that Mitchell had a lengthy criminal history, and the prosecutor would have confronted Mitchell with his felony convictions. (Doc. 10-7 at 129)

At trial, Mitchell under oath waived his right to testify as follows (Doc. 10-2 at 431–33):

| [Court:] | All right. You can put your hand down. Mr. Mitchell, you have been present of course throughout the entire trial. As you know, we are at a stage where the State of Florida has rested their case against you. They are done. They are not going to call any more witnesses against you.

It is now your opportunity, the defense's opportunity to call any witnesses you may wish to call on your own behalf, and that includes you. You have the right to take the witness stand and to testify in your own defense. If you choose to testify you will subject yourself to cross-examination by one of the Assistant State Attorneys and I will advise the jury that they are to |

consider your testimony like that of any other witness.

You also have the right not to testify. You have the right to remain silent. One of the greatest rights we have in this country. If you choose not to testify I will advise the jury that they are not to consider that in any way in their deliberations or consider it an admission of guilt or be swayed or influenced by that decision in any way.

It is always a very important decision a defendant has to make as to whether or not to testify on their own defense. Have you had an opportunity to discuss that decision with your attorney?

[Mitchell:]        Yes, sir.

[Court:]        Have you made a decision in this case?

[Mitchell:]        Yes, sir.

[Court:]        And what is your decision, sir?

[Mitchell:]        I choose not to get on the stand.

[Court:]        Not to testify?

[Mitchell:]        Yes.

[Court:]        Has anyone promised you anything or threatened you in any way in order to get you to make this decision?

[Mitchell:]        No, sir.

[Court:]        You are making this decision freely and voluntarily, of your own free will?

[Mitchell:]        Yes, sir.

Because Mitchell admitted to trial counsel that he burglarized the house, never told trial counsel about his conversation with the realtor, would have faced vigorous cross-

examination concerning his lengthy criminal history if he had testified, and knowingly and voluntarily waived his right to testify, trial counsel did not deficiently perform and the state court did not unreasonably apply *Strickland*. *Downs v. Sec'y, Fla. Dep't Corrs.*, 738 F.3d 240, 263 (11th Cir. 2013) ("Certainly, counsel's refusal to suborn perjury does not constitute deficient performance."); *Preston v. Sec'y, Dep't Corrs.*, 745 F. App'x 835, 838 (11th Cir. 2018) ("Preston's counsel, therefore, did not give him any affirmative misadvice because he was correct that Preston's criminal history could come out if he testified and, further, that the details of that history could come out if Preston opened the door.").

Ground Four is **DENIED**.

**Ground Five**

Mitchell asserts that trial counsel was ineffective for conceding at trial, without Mitchell's consent, guilt to trespassing, a lesser offense. (Doc. 1 at 13) The post-conviction court denied the claim as follows (Doc. 10-7 at 15–17) (state court record citations omitted):

> . . . Defendant asserts counsel was ineffective for conceding his guilt to the lesser offense of trespass and doing so without Defendant's consent. Defendant again asserts he told counsel he had a valid defense as the burglarized house was for sale and open to the public, and he was on the property legally. Defendant asserts counsel's concession of guilt prejudiced him because it deprived him of "his cloak of innocence" and conceding guilt to an illegal act contributed to the guilty verdict. Defendant contends the result of the proceedings would have been different had counsel not conceded Defendant's guilt.
>
> During the October 4, 2017, evidentiary hearing, Mr. Caimano testified that the theory of defense was that "the State could not prove beyond a reasonable doubt that he had broken into the house with the intent to commit a crime." He and Defendant discussed this theory of defense, and Defendant requested that Mr. Caimano see if they could get less prison time or fifteen years in prison without the PRR designation. He and Defendant discussed the possibility of a trespass and Defendant would have been happy with a trespass. Mr. Caimano testified

there was significant evidence of Defendant's guilt, and sufficient evidence of a trespass, [and] therefore, they would alternatively ask the jury to find him guilty of a trespass, which was only punishable by a year in the county jail.

During the October 4, 2017, evidentiary hearing, Defendant testified that he and Mr. Caimano did not discuss conceding to a trespass, and if Mr. Caimano had told him, he would not have agreed to it.

The record reflects Mr. Caimano did not explicitly concede Defendant committed a trespass but acknowledged that Defendant's DNA was on both the outside and inside of the broken window and argued the State did not prove Defendant entered the house and removed any property or that he had any intent to commit an offense.

After considering Defendant's motion, the State's response, the court file and record, as well as the testimony and evidence presented during the October 4, 2017, evidentiary [hearing], and the written arguments of counsel[ ], the Court finds Defendant has failed to meet his burden under *Strickland*. The Court finds the testimony of Mr. Caimano to be more credible than that of Defendant. Mr. Caimano believed there was significant evidence against Defendant and sufficient evidence for a trespass, [and] therefore, a trespass was an alternative to a finding of guilt. Mr. Caimano and Defendant discussed the trial strategy and argument for the lesser offense of trespass, and Defendant would have been satisfied with a trespass. In light of Defendant's admissions to counsel as discussed in [the ground] above as well as the unrefuted presence of Defendant's DNA on the broken window, the Court finds Mr. Caimano's trial strategy and any concession to a trespass was reasonable. As such, Defendant has failed to show that counsel performed deficiently. No relief is warranted [ ].

The post-conviction court found trial counsel more credible than Mitchell at the evidentiary hearing (Doc. 10-7 at 17), and a state court's credibility determination receives deference in federal court. *Nejad*, 830 F.3d at 1292.

At the evidentiary hearing, trial counsel explained that the theory of defense was that "the State could not prove beyond a reasonable doubt that [Mitchell] had broken into the

house with the intent to commit a crime." (Doc. 10-7 at 99) Trial counsel testified that he discussed with Mitchell the theory of defense, and Mitchell asked trial counsel: "To see if we could get him 15 years without the PRR [enhancement]. Give me a little less prison, less prison." (Doc. 10-7 at 99) Trial counsel believed that Mitchell would have wanted to present evidence to show a legal reason why Mitchell was at the house but no evidence supported a legal reason. (Doc. 10-7 at 99) Trial counsel discussed with Mitchell the lesser crime of trespass, and trial counsel believed that Mitchell "would have been extremely happy with that." (Doc. 10-7 at 103) Trial counsel explained that Mitchell faced fifteen years in prison as a prisoner releasee reoffender, and trespass was punishable by a year in jail. (Doc. 10-7 at 104–05, 116) A defendant qualifies as a prisoner releasee reoffender if he commits a felony enumerated in Section 775.082(9), Florida Statutes, and trespass, a misdemeanor, is not enumerated in the statute. § 810.08(2)(a), Fla. Stat.

During closing argument, trial counsel argued that Mitchell never told police that he burglarized the particular house in this case (Doc. 10-7 at 312), the property supervisor had felony convictions which raised significant suspicion about his guilt of the burglary (Doc. 10-7 at 315–16), a fingerprint on the window did not match Mitchell's fingerprints which proved that someone else committed the crime (Doc. 10-7 at 317), DNA evidence on the window only proved that Mitchell stuck his hand through the window but did not prove that Mitchell had an intent to commit an offense inside the house (Doc. 10-7 at 318–19), and the absence of other blood inside the house confirmed that Mitchell never entered the house. (Doc. 10-7 at 320–22) Trial counsel did not specifically ask the jury to find Mitchell guilty of trespass.

Because the record shows that trial counsel did not ask the jury to find Mitchell guilty of trespass and, even so, reasonable counsel might have asked the jury to find Mitchell guilty of the misdemeanor considering the unrebutted DNA evidence and the prison releasee reoffender sentencing enhancement, the state court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 690. *Kelly v. United States*, 820 F.2d 1173, 1176 (11th Cir. 1987); *McNeal v. Wainwright*, 722 F.2d 674, 677 (11th Cir. 1984).

Ground Five is **DENIED**.

**Ground Six**

Mitchell asserts that trial counsel was ineffective for not calling Corporal Liza Doane and Officer Jeff Sanchez as witnesses at trial. The post-conviction court denied the claim as follows (Doc. 10-7 at 17–19) (state court record citations omitted):

> . . . Defendant alleges counsel was ineffective for failing to call [Corporal] Doane and Officer Sanchez as defense witnesses. Defendant asserts the State showed Defendant had independent knowledge of the instant offenses through Detective Bishop's and Detective Trlak's testimony that before the detectives even told Defendant about the offenses, Defendant spontaneously stated he went to "abandos" to take copper and metal. Defendant contends, however, that [Corporal] Doane and [Officer] Sanchez, the officers who arrested him, had already told him about the offenses and that copper and metal had been stolen. Defendant asserts the officers were available to testify, and if counsel had called them to testify, they would have refuted the State's evidence. Defendant asserts that he told counsel that [Corporal] Doane and [Officer] Sanchez had advised him of the offenses and the theft of scrap metal, but counsel failed to depose or call those officers. Defendant claims there is a reasonable probability the outcome of the proceedings would have been different had counsel called [Corporal] Doane and [Officer] Sanchez.
>
> During the October 4, 2017, [evidentiary hearing], Defendant presented the testimony of Corporal Liza Doane and Officer Jeff Sanchez. Corporal Doane testified that she and Officer Sanchez were sent to Defendant's home, pursuant to a probable

cause affidavit, to arrest him for the instant offenses. She was not familiar with the case and did not recall having any knowledge of what had been stolen nor any conversation with Defendant other than advising him of the offenses for which he being arrested. Neither she nor Officer Sanchez asked Defendant about the case. Officer Sanchez did not have an independent recollection of this case. Detective Richardson testified Corporal Doane and Officer Sanchez would have been aware of the offenses for [which] Defendant was arrested, but did not recall whether she would have told them what was stolen.

During the October 4, 2017, hearing, Mr. Caimano testified he did not think Corporal Doane or Officer Sanchez "offered anything towards a defense" and he did not speak to either before trial.

During the October 4, 2017, hearing, Defendant testified that he told Mr. Caimano [Corporal] Doane and [Officer] Sanchez told him exactly what was stolen after they arrested him, and he asked Mr. Caimano to contact them. Mr. Caimano told him it was not necessary to call them as witnesses and the State could not prove its case.

After considering Defendant's motion, the State's response, the court file and record, as well as the testimony and evidence presented during the October 4, 2017, evidentiary hearing, and the written arguments of counsel[ ], the Court finds Defendant has failed to meet his burden under *Strickland*. At the evidentiary hearing, Defendant failed to demonstrate that either Corporal Doane or Officer Sanchez had any knowledge of or told him exactly what had been stolen. The Court does not find credible Defendant's testimony on this issue. Consequently the Court finds Defendant has failed to demonstrate counsel performed deficiently in failing to call Corporal Doane or Officer Sanchez or that he was prejudiced by counsel's failure to do so. No relief is warranted [ ].

The post-conviction court found Mitchell's testimony not credible at the evidentiary hearing (Doc. 10-7 at 19), and a state court's credibility determination receives deference in federal court. *Nejad*, 830 F.3d at 1292.

At the hearing, Corporal Doane testified that she went with Officer Sanchez to Mitchell's home to arrest Mitchell. (Doc. 10-7 at 72–73) Detective Richardson told Corporal Doane that a probable cause affidavit supported the arrest. (Doc. 10-7 at 73) Corporal Doane was not familiar with details of the case. (Doc. 10-7 at 73) Corporal Doane found Mitchell outside his home, advised him of the charges, and handcuffed him. (Doc. 10-7 at 74–76) Corporal Doane told Mitchell that the detective wanted to speak with him about the case, but Corporal Doane was not familiar with the case and could not provide Mitchell any details. (Doc. 10-7 at 75) Corporal Doane did not advise Mitchell of his constitutional rights because Corporal Doane did not ask him a question about the case. (Doc. 10-7 at 75)

Officer Sanchez testified that he and Corporal Doane went to Mitchell's home to arrest Mitchell. (Doc. 10-7 at 78–79) Detective Richardson told Officer Sanchez that "she had charges on [Mitchell] and that she had a — it was based on DNA." (Doc. 10-7 at 79) The detective did not tell Officer Sanchez the details of the crime. (Doc. 10-7 at 79) When Officer Sanchez arrived at Mitchell's home, the officer saw Mitchell outside his home, approached Mitchell, informed Mitchell that he was under arrest, and told Mitchell that the detective wanted to speak with him. (Doc. 10-7 at 79) Officer Sanchez did not remember Mitchell saying anything about scrap metal and did not advise Mitchell of his constitutional rights because Detective Richardson intended to interview Mitchell. (Doc. 10-7 at 80) After the detective finished the interview, Officer Sanchez transported Mitchell to the jail. (Doc. 10-7 at 81)

Trial counsel testified that he did not call Corporal Doane and Officer Sanchez as witnesses at trial because "[t]o [him] it did not seem like they offered anything towards a defense." (Doc. 10-6 at 105) Trial counsel reviewed Corporal Doane's supplemental police

45

report and testified that the report was brief and showed that Corporal Doane only transported Mitchell to the police station. (Doc. 10-7 at 116–17) Trial counsel generally did not depose a police officer who only transports a defendant. (Doc. 10-7 at 117)

Because both Corporal Doane and Officer Sanchez denied discussing the details of the burglary with Mitchell during his arrest, trial counsel did not deficiently perform and the state court did not unreasonably deny the claim. *Wong*, 558 U.S. at 27. *McKiver v. Sec'y, Fla. Dep't Corrs.*, 991 F.3d 1357, 1365 (11th Cir. 2021) ("[W]e have held that a petitioner's own assertions about whether and how a witness would have testified are usually not enough to establish prejudice from the failure to interview or call that witness.").

Ground Six is **DENIED**.

## Ground Seven

Mitchell asserts that trial counsel was ineffective for not calling Dianne Hart as a witness at trial. (Doc. 1 at 17–18) The post-conviction court denied the claim as follows (Doc. 10-7 at 19–22) (state court record citations omitted):

> . . . Defendant asserts counsel was ineffective for failing to call Dianne Hart at trial. Defendant contends Ms. Hart was the realtor who listed the burglarized house at issue and she was available to testify. Defendant contends Ms. Hart would have testified that the burglarized house was for sale and open to the public. Ms. Hart would have testified that she often instructs potential buyers to look around the property before showing a house, prospective buyers often look around property and inside windows of houses for sale, and other realtors had shown people that property. Defendant contends counsel knew and the police report indicated the house was for sale and open to the public, and Defendant requested that he call Ms. Hart, but counsel did not do so. Defendant asserts Ms. Hart's testimony would have rebutted the testimony of State's witness Privet, who testified that he did not know Defendant, did not give Defendant permission to go on the property[,] and that Defendant should not have been at the burglarized house. Ms. Hart's testimony would have supported a theory of defense that

would have explained why Defendant's DNA was on the window. Defendant contends Ms. Hart's testimony would have resulted in a dismissal or [judgment of acquittal] or "weakened the State's case to such a degree that it is a reasonable probability the outcome could have been different."

[D]uring the October 4, 2017, evidentiary hearing, Mr. Caimano testified that Defendant admitted to him that he broke into the house to steal copper and he cut his arm on the window while he was breaking into the house. Mr. Caimano recalled Defendant may have advised him there was more opportunity to get an air conditioning unit or copper wiring by breaking into vacant houses or houses for sale. Mr. Caimano testified Defendant did not tell him he was only viewing the house as it was for sale, and Defendant did not give him the name or phone number of the realtor, Dianne Hart; Defendant did not tell him he contacted Ms. Hart or that [Ms. Hart] advised him to go ahead and look around the house first and to contact her if he still wanted to see the inside of the house. Mr. Caimano further testified Defendant did not tell him the window of the house was already broken or that Defendant cut his hand as he reached through the broken window only to move the blinds over so he could see the inside of the house.

Based on his conversation with Defendant, Mr. Caimano stated he did not have any evidence to present a legal reason for Defendant's presence in the house and he did not contact or otherwise investigate Ms. Hart. Mr. Caimano testified that the theory of defense was that "the State could not prove beyond a reasonable doubt that he had broken into the house with the intent to commit a crime."

During the October 4, 2017, evidentiary hearing, Defendant testified that he told Mr. Caimano the following: Defendant called Ms. Hart to look at the house, and she told him "to go ahead and take a look at it and give her a call back" to look inside; Defendant then went to the house and looked around; he went around the back of the house, and saw a window [with] mission blinds and the window had a hole in it; he lifted up the blinds and peeked through the hole to see inside the house and cut his finger; he then left. Defendant testified that he did not enter the house nor take an AC unit or any copper, and he never returned to the house. Defendant testified that he never told Mr. Caimano he broke into the house or stole anything. Defendant further testified that he told Mr. Caimano he wanted him to call

Ms. Hart as a witness, but Mr. Caimano said they did not need to call any witnesses and the State could not prove its case.

During the October 4, 2017, evidentiary hearing, Defendant presented the testimony of Ms. Hart. She testified that she was not the listing realtor for the instant property, but she was a realtor and showed the property. She testified it is common practice to have a person meet her at a house and for people to look around the properties and through windows. She could not recall if there was a fence around the instant property. Although she could not recall the date or time, she recalled receiving a phone call from a young male who wanted to see the house, and she told him she would meet him at the house. When she entered the house, she noticed broken glass, and insulation on the floor, and realized someone had broken into house. She then alerted the property contact person and law enforcement.

After considering Defendant's motion, the State's response, the court file and record, as well as the testimony and evidence presented during the October 4, 2017, evidentiary hearing, and the written arguments of counsel[ ], the Court finds Defendant has failed to meet his burden under *Strickland*. The Court finds the testimony of Mr. Caimano to be more credible than that of Defendant. The Court finds Defendant admitted to Mr. Caimano that he committed the instant offenses and broke into the house and stole the copper wiring and air conditioning unit. Defendant did not tell Mr. Caimano he was only looking at the house that was for sale, or that he contacted the realtor, Ms. Hart, or that she instructed him to look around the property; Defendant did not tell Mr. Caimano he cut his hand only after sticking his hand through a pre-existing hole in the window to move the blinds so he could see inside the house. Mr. Caimano and Defendant discussed the theory of defense, which was to argue that the State had failed to prove the elements of burglary. In light of Defendant's admissions to counsel, Mr. Caimano's trial strategy was reasonable as was his failure to contact Ms. Hart. The Court finds Defendant has failed to demonstrate that counsel performed deficiently in failing to call Ms. Hart as a witness. No relief is warranted [ ].

The post-conviction court found trial counsel more credible than Mitchell at the evidentiary hearing (Doc. 10-7 at 19), and a state court's credibility determination receives deference in federal court. *Nejad*, 830 F.3d at 1292.

Trial counsel testified that Mitchell admitted that he broke into the house and stole copper wiring. (Doc. 10-7 at 91–92) Trial counsel learned from a police report that the house was for sale. (Doc. 10-7 at 93) Trial counsel and Mitchell discussed that a house for sale is usually vacant and provides an opportunity to steal an air conditioner and copper wiring. (Doc. 10-7 at 93)

Trial counsel did not remember Mitchell providing him the name and telephone number of a realtor named Dianne Hart. (Doc. 10-7 at 93) Mitchell never told trial counsel that Mitchell had spoken with the realtor and never told trial counsel that the realtor invited him to look at the house by himself. (Doc. 10-7 at 94) Mitchell never told trial counsel that Mitchell went to the house, discovered the window already broken, and cut his arm on the broken window when he moved some blinds to look inside. (Doc. 10-7 at 94–95) Trial counsel learned that the realtor had called the maintenance supervisor to report the burglary, but trial counsel did not speak with the realtor to find out if the realtor could provide exculpatory testimony. (Doc. 10-7 at 101–02)

Dianne Hart, the realtor, testified that she was not the realtor who listed the house for sale. (Doc. 10-7 at 131) The realtor saw a sign in the front yard of the house advertising the house for sale. (Doc. 10-7 at 131–32) The house was vacant, and the front yard was open. (Doc. 10-7 at 133) The realtor commonly told potential buyers to walk around the outside of a house for sale. (Doc. 10-7 at 132, 135–36) A young man called the realtor about the house, and the realtor went to the house to show him the house. (Doc. 10-7 at 134) When she met the young man at the house, the man told her that a window was broken. (Doc. 10-7 at 136) The realtor went inside and saw broken glass and insulation on the floor

49

and a ladder coming down from a ceiling. (Doc. 10-7 at 136) The realtor assumed that someone had taken the air conditioner handler from the attic. (Doc. 10-7 at 137)

Because Mitchell admitted to trial counsel that he burglarized the house and the realtor did not testify that she spoke with Mitchell and invited him to visit the house by himself, trial counsel did not deficiently perform and Mitchell failed to show that the outcome at trial would have changed. Consequently, the state court did not unreasonably apply *Strickland*. *Wong*, 558 U.S. at 27; *McKiver*, 991 F.3d at 1365.

Ground Seven is **DENIED**.

**Ground Eight**

Mitchell asserts that trial counsel was ineffective for not presenting his mental health history as mitigating evidence at sentencing. (Doc. 1 at 19–20) He contends that the trial court would not have imposed a habitual felony offender enhancement if trial counsel had presented that mitigating evidence. (Doc. 1 at 19–20) The post-conviction court denied the claim as follows (Doc. 10-7 at 22–25) (state court record citations omitted):

> . . . Defendant asserts counsel was ineffective for failing to seek a downward departure or present his history of mental illness to the Court. Defendant asserts that the police report reflects he told Detective Richardson that he heard voices and was taking medication. Defendant asserts counsel only presented the pre-sentence investigation but failed to present any evidence of his mental health history to the Court. Defendant asserts that if counsel had presented evidence of his mental health history to the Court, he would have received a different sentence.

> During the October 4, 2017, evidentiary hearing, Defendant presented the testimony of [Dr.] Richard Carpenter. Dr. Carpenter testified that he reviewed Defendant's mental health records, and Defendant has a significant mental health history dating back to 2007, including diagnoses of bipolar disorder in 2007 and a subsequent diagnosis of psychosis with bipolar features, a history of substance abuse, a Baker Act in 2007[,] and a finding that he was incompetent to proceed in 2011.

50

Defendant has further been prescribed numerous medications in light of his diagnoses. Dr. Carpenter believes Defendant has schizoaffective disorder, bi-polar type, and a cocaine and alcohol dependence problem. Dr. Carpenter opined that in light of the records he reviewed, it is "possible," or it is a "reasonable supposition" that Defendant's capacity to appreciate the criminal nature of his conduct or to conform his conduct was substantially impaired. Dr. Carpenter noted, however, he could not offer a "firm opinion" based on his "*post-hoc* analysis" in this case. Dr. Carpenter further acknowledged that he has not interviewed Defendant.

During the October 4, 2017, evidentiary hearing, Mr. Caimano testified he received and reviewed the competency evaluations in this case and was aware Defendant had a history of hearing voices and was on medication, had a history of bipolar and schizophrenia and hallucinations, was taking medications, [and] had previously been Baker Acted. Mr. Caimano testified that the PSI and court record reflected Defendant's Baker Act, and competency evaluations and mental health and substance abuse issues. Mr. Caimano acknowledged that he did not retain a mental health expert.

During the October 4, 2017, evidentiary hearing, Defendant testified that he told Mr. Caimano and Mr. Caimano was aware of his mental heath issues.

A review of the sentencing record reflects the State introduced Defendant's penitentiary packet, which documented Defendant's seven prior sentences, and certified copies of his prior convictions. Defendant and Mr. Caimano reviewed the State's sentencing documents and stipulated he qualified as both a PRR and HFO. The record further reflects that [at] sentencing, the trial judge described Defendant as "one of the most habitual offenders" he had seen on the bench, noted that his prior incarcerations had not helped Defendant, and cited to Defendant's "horrible record" and the need to punish him for his crimes. The record further reflects the PSI and Defendant's letter to the Court referenced Defendant's substance abuse issues, Baker Act[,] [ ] finding of incompetence[,] and commitment to the Florida State Hospital. The record further reflects that the sentencing judge also entered the orders for competency evaluations and finding Defendant incompetent to proceed based on those competency evaluations.

>After considering Defendant's motion, the State's response, the court file and record, as well as the testimony and evidence presented during the October 4, 2017, evidentiary [hearing], and the written arguments of counsel[ ], the Court finds Defendant has failed to meet his burden under *Strickland*. The sentencing court was aware of Defendant's mental health history as well as his criminal and incarceration history. In light of Dr. Carpenter's *post-hoc* analysis and tentative opinion at the evidentiary hearing, Defendant's extensive criminal history, including seven prior prison sentences, and the trial judge's sentencing comments, the Court finds Defendant has failed [to show] the outcome of the proceeding would have been different had counsel presented mental health mitigation at sentencing. No relief is warranted [ ].

Whether the trial court would have granted a motion for a downward departure is an issue of state sentencing law, and a state court's determination of state law receives deference in federal court. *Machin*, 758 F.2d at 1433.

At the evidentiary hearing, Dr. Richard Carpenter, a psychologist, testified that he had reviewed Mitchell's mental health records (Doc. 10-7 at 33–34), explained that a doctor diagnosed Mitchell with bipolar disorder with psychotic features (Doc. 10-7 at 34), described medications that doctors had prescribed Mitchell (Doc. 10-7 at 34–35), identified Mitchell's abuse of cocaine, alcohol, and marijuana (Doc. 10-7 at 35), explained that a court had civilly committed Mitchell when Mitchell stopped taking medication, and confirmed that a court had found Mitchell incompetent. (Doc. 10-7 at 35–37) The doctor described the impairment of Mitchell's capacity to appreciate the criminal nature of his conduct as follows (Doc. 10-7 at 37–38):

>[3.850 counsel:]    Based on your review of his records and his history was his capacity to appreciate the criminal nature of his conduct or to conform his conduct substantially impaired?
>
>. . .

> [Witness:]    Well, I would say that based on his history, it's possible. I really couldn't offer a firm opinion based on the fact that I'm doing this *post-hoc* analysis. If I had seen him at the time I could have inquired. But I think it's a reasonable supposition that he might have been, based on the history that I have seen.

Dr. Carpenter would have testified at a sentencing hearing that Mitchell needed specialized treatment for his mental disorder at a "residential dual diagnosis treatment center." (Doc. 10-7 at 38) Dr. Carpenter acknowledged on cross-examination that he had never met Mitchell. (Doc. 10-7 at 39)

Trial counsel testified that he discussed with Mitchell before trial his mental health history. (Doc. 10-6 at 106) Trial counsel knew that Mitchell told Detective Richardson that he heard voices and took medication. (Doc. 10-6 at 106–07) Trial counsel learned that a court had civilly committed Mitchell, three doctors had found Mitchell incompetent, and Mitchell suffered from schizophrenia and bipolar disorder and took medication for the mental disorders. (Doc. 10-6 at 107–08) To present mitigating evidence of Mitchell's mental health at sentencing, trial counsel asked Mitchell's mother to testify about her knowledge of Mitchell's psychological issues and asked the probation officer to review Mitchell's mental health records and summarize his mental health history when preparing the presentence investigation report. (Doc. 10-6 at 108–09)

Trial counsel explained why he did not argue that Mitchell needed treatment instead of incarceration as follows (Doc. 10-6 at 113–14):

> [3.850 counsel:]    So based on all the mental health history why didn't you believe you had any convincing argument to argue to the judge that he needs treatment and that he's not

a danger to the public based on the mental health history?

[Trial counsel:]   My understanding after reviewing all the evaluations and speaking with Mr. Mitchell, speaking with his mother, was that when he is on medication and he takes his medication, that he's not as likely to commit the crimes, right?

So then when he's not taking his medication as he is supposed to be doing or as it's prescribed to him, that that's when he commits the crimes. That's my understanding of the overall theme throughout all of the evaluations that were done of him.

So to be frank, it's a case where these crimes are being committed when he's not taking medication whether or not he's — whether or not he's getting treatment or not. Because he was getting treated. As you say, he had been Baker Acted. He was under the care of a psychologist. That he would be on medication. But that's being treated.

And when you're under treatment you can still not take your medications, and then he would commit crimes is how I understood it.

The presentence investigation report described Mitchell's mental health history, including auditory and visual hallucinations, his civil commitment, his incompetence to stand for trial, and his abuse of cocaine. (Doc. 10-9 at 28) In a letter to the judge, Mitchell described his addiction to cocaine and asked for intensive treatment. (Doc. 10-9 at 33–34) At sentencing, Mitchell and his mother testified about Mitchell's addiction to drugs, and Mitchell explained that he had run out of medication, did not remember committing the crime, and had improved after receiving mental health treatment. (Doc. 10-9 at 7–11) Before

pronouncing the sentence, the trial judge described Mitchell's criminal history as follows (Doc. 10-9 at 16):

> [Trial judge:]   Well, I put a lot of thought into this case and Mr. Mitchell has a horrible record and it's clear that prison has not helped him. But then again, it's not prison's role to help people. I think some people get confused about that. While rehabilitation is great, the primary role of our court system is to punish people for crimes they have committed. So he needs to be punished for these crimes. He's one of the most habitual offenders I have seen in my years on the bench.

Mitchell qualified as both a prison releasee reoffender and a habitual felony offender, and the trial judge could impose no less than fifteen years in prison and no greater than thirty years. (Doc. 10-9 at 15) §§ 775.082(9)(a)(3)(c), 775.084(4)(a)(2), and 810.02(1)(b)(3)(b), Fla. Stat. The trial court sentenced Mitchell to thirty years as a habitual felony offender. (Doc. 10-2 at 173–81) To impose a downward departure based on the substantial impairment of Mitchell's capacity to appreciate the criminal nature of his conduct, the trial court had to find that the habitual felony offender enhancement was not necessary for the protection of the public. §§ 775.084(4)(e), (h) and 921.0026(2)(c), Fla. Stat. *Fitzpatrick v. State*, 884 So. 2d 981, 982 (Fla. 1st DCA 2004).

Because the trial judge knew about both Mitchell's mental health history and his lengthy criminal history, and Dr. Carpenter could not offer a "firm opinion" whether Mitchell's capacity to appreciate the criminal nature of his conduct was substantially

impaired, Mitchell failed to show that the outcome at sentencing would have changed and the state court did not unreasonably deny the claim. *Strickland*, 466 U.S. at 694.

Ground Eight is **DENIED**.

Accordingly, it is **ORDERED** that Mitchell's petition (Doc. 1) is **DENIED** because all claims in the petition are without merit. The Clerk is **DIRECTED** to enter a judgment against Mitchell and **CLOSE** this case.

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL *IN FORMA PAUPERIS*

The Court finds that reasonable jurists could debate whether Ground Two "should [be] resolved in a different manner" and "the issues presented [are] 'adequate to deserve encouragement to proceed further.'"

Therefore, the Court **GRANTS** a certificate of appealability as to Ground Two: (1) whether the state court unreasonably applied *Miranda* and *Strickland* under 28 U.S.C. § 2254(d) by denying Mitchell's claim that trial counsel was ineffective for not moving to suppress his statements to police where they were obtained in violation of *Shatzer*; and (2) whether Mitchell could demonstrate prejudice under *Strickland* for the claim. *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000) (citation omitted).

For all remaining grounds, a certificate of appealability is **DENIED**. 28 U.S.C. § 2253(c)(2). *Slack*, 529 U.S. at 478. If Mitchell intends to appeal, he must file a notice of appeal in this Court. Rule 11(b), Rules Governing Section 2254 Cases. If Mitchell intends to seek leave to appeal *in forma pauperis*, he must file a motion for leave to appeal *in forma pauperis* in this Court. Fed. R. App. P. 24(a)(1).

**DONE AND ORDERED** in Tampa, Florida on March 22, 2022.

_____
MARY S. SCRIVEN
UNITED STATES DISTRICT JUDGE